**Luiz Eduardo Fontes WILLIAMS Plaintiff,**

v.

**J.P. MORGAN & CO., INC. Defendant.**

**No. 00 CIV. 6321(VM).**

United States District Court, S.D. New York.

Dec. 19, 2003.

See also, 199 F.Supp.2d 189, 248 F.Supp.2d 320.

R. Scott Greathead, Howe & Addington, L.L.P., New York City, for Plaintiff/Counter Defendant.

Bradley I. Ruskin, Jeremy J. Best, Peter J.W. Sherwin, Proskauer Rose, L.L.P., New York City, for Defendant/Counter Claimant/ThirdParty Plaintiff.

David Spencer, Wiggin & Dana LLP, New York City, for ThirdParty Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

### I. INTRODUCTION

Defendant, J.P. Morgan & Co., Inc. ("Morgan") moves for summary judgment in this action for breach of fiduciary duty arising out of Morgan's management of an inter vivos trust. Morgan argues that the plaintiff, Luiz Eduardo Fontes Williams ("Williams"), a remainderman of the trust, ·cannot establish any damages and therefore cannot successfully maintain a claim for breach of fiduciary duty. For the reasons set forth below, the Court denies Morgan's motion.

### II. FACTS

The facts of this case have been set forth in two prior decisions of this Court, *Williams v. J.P. Morgan & Co., Inc.*, 199 F.Supp.2d 189 (S.D.N.Y.2002) ("*Williams I*") and *Williams v. J.P. Morgan & Co., Inc.*, 248 F.Supp.2d. 320 (S.D.N.Y.2003) ("*Williams II*"), familiarity with which is assumed. Only information relevant to the instant motion for summary judgment will be presented here.

Williams and his brother Anthony Forrest Williams are the remaindermen of the Gem Trust (the "Trust"), an inter vivos trust created by their father in 1958. Their mother, Maria Williams, a citizen and resident of Brazil, is the sole income

beneficiary of the Trust. Morgan was appointed trustee of the Trust at its creation.

In the late 1960s, the United States and Brazil began negotiating a bilateral tax treaty (the "Treaty") which, if approved, might have had adverse tax consequences on Maria Williams's interest in the Trust. To avoid these consequences, Morgan liquidated the assets of the Trust in late 1970 and 1971 and invested the proceeds in tax-exempt bonds.

The Treaty was never ratified. Morgan continued to invest the assets of the trust in tax-exempt bonds and cash rather than in potentially more lucrative alternatives. On June 1, 2001, Morgan reinvested the Trust assets in a diversified portfolio.

Williams filed this suit against Morgan for breach of fiduciary duty as trustee. He alleges that Morgan mismanaged the assets of the trust, wrongfully retained assets it should have sold, and failed to diversify the assets of the Trust. Williams alleges that by January 1, 1975, Morgan knew or should have known that the Treaty was not going to be ratified, and should not have continued to design its investment strategy for the Trust around the possible ratification of the Treaty. On January 1, 1975, the Trust was valued at $767,123. When Morgan diversified the assets of the Trust on June 1, 2001, the Trust's value was $787,221.

In *Williams I*, 199 F.Supp.2d. at 194, this Court held that should a trier of fact ultimately find Morgan liable, the proper measure of damages in this case would be the value of any lost capital as determined by the formula enunciated by the New York Court of Appeals in *In re Janes' Estate*, 90 N.Y.2d 41, 659 N.Y.S.2d 165, 681 N.E.2d 332, 339 (1997). Following *Janes' Estate*, this Court ruled that "to measure lost capital a court must first determine the value of the asset on the date on which it should have been sold and then subtract either (a) the value of the asset at the time of the accounting or (b) the value of the asset at the time of the court's decision." 199 F.Supp.2d at 194. The Court also noted that it has discretion to award interest. *Id.* Finally, the Court stated that under *Janes*, 659 N.Y.S.2d 165, 681 N.E.2d at 340, it should subtract from any award of interest any dividends or income attributable to the asset during the time that the asset was retained. *Id.*

Morgan now moves for summary judgment on the ground that even if Morgan did breach its fiduciary duties as trustee, Williams has suffered no damages under the formula established in *Williams I*. Morgan argues that the Trust did not lose any capital, that as a remainderman Williams can sue only for lost capital, and that even if he could also sue for lost income to the trust, there was no lost income.

### III. DISCUSSION

#### A. STANDARD OF REVIEW

Summary judgment may be granted if there is "no genuine issue as to any material fact" and if "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court will draw all reasonable inferences in favor of the non-moving party. *See Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992).

When a federal court is sitting in diversity, it must follow the substantive law set forth by the highest court of the state whose law it is applying. *See Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 195 (2d Cir.1989); *Williams I*, 199 F.Supp.2d at 194. A federal court is not bound by decisions of lower state courts. *See Calvin Klein*, 892 F.2d at 195; *Williams I*, 199 F.Supp.2d at 194.

"Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994); *see also, First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 165 (2d Cir.1998).

## B. *LOST CAPITAL*

■ To succeed in a claim for breach of fiduciary duty, a plaintiff must demonstrate "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." *Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F.Supp.2d 178, 188 (S.D.N.Y.2000).

Without conceding that Williams can prove the first two elements of this test, Morgan attacks the third element in its present motion for summary judgment. Morgan argues that Williams cannot establish that he suffered any damages and therefore cannot maintain a successful claim for breach of fiduciary duty.

■ In his role as a remainderman, Williams may recover only lost principal of the trust, for as a remainderman that is the only portion of the estate in which he has an interest while the income beneficiary remains alive. *See* N.Y. Est. Powers & Trusts Law § 11–2.1; *In re Malasky*, 290 A.D.2d 631, 736 N.Y.S.2d 151, 153 (3rd Dep't 2002); George Gleason Bogert, *The Law of Trusts and Trustees* § 701 at 193–94 (2d ed.1982). Morgan argues that under the lost capital formula set forth in *Janes' Estate* and adopted by this Court in *Williams I*, the Trust did not lose any capital between 1975 and 2001.

■ The parties have agreed to use January 1, 1975 as the date by which Morgan allegedly knew or should have known that the Treaty would not be ratified. The parties disagree as to whether the value of the Trust on January 1, 1975 should be used as the starting point for a damages calculation. Williams notes that under *Williams I*, the first step in the damages calculation is to determine the value of the Trust on the date that the investments should have been sold. Williams then claims that this is a different date from January 1, 1975, the date on which Morgan knew or should have known to sell the investments and diversify the trust. Williams argues that a trustee is typically allowed a reasonable time to sell investments once it is no longer reasonable for the trustee to hold those investments, and that the Court should use the value of the Trust principal on the date at the end of that reasonable period of time as an initial valuation of the principal in a damages calculation.

Williams presumably makes this argument in part because, as stated above, on January 1, 1975, the value of the Trust was $767,123, and on June 1, 2001, when Morgan diversified the Trust, the value was $787,221. Under a strict application of the formula for calculating damages, the use of January 1, 1975 as a starting date for the value of the Trust would appear to yield a net gain, rather than a loss, in the value of the Trust. Williams instead advocates using July 15, 1975, when the Trust was valued at $808,759, as the date on which Morgan should have diversified the trust. Williams explains that he selected that date because it is the next available valuation after January 1, 1975 provided by Morgan, but he acknowledges that a different date might also adequately represent a reasonable period of time after January 1, 1975 within which Morgan could have diversified the Trust. The use of the July 15, 1975 date also would allow Williams to establish some amount of lost capital between then and June 1, 2001

under a strict application of the damages calculation.

Assuming, solely for the purposes of this summary judgment motion, that Morgan should have diversified the Trust assets at some point prior to June 1, 2001, the Court does not need to decide now the exact date on which Morgan should have done so. Whether Morgan's management of the Trust between January 1, 1975, when it presumably knew or should have known to diversify the trust, and June 1, 2001, when it ultimately did diversify the trust, yielded a *de minimis* net gain or loss of actual dollars cannot adequately resolve the dispute in this case.

Morgan argues that the Trust gained at least $20,098 between January 1, 1975 and June 1, 2001.[1] Williams acknowledges the nominal actual gain in the value of the Trust but argues that, had Morgan diversified the Trusts's holdings sooner as it should have done, the true value of the Trust principal alone—*i.e.*, excluding any possible lost income to the Trust—should be over $2.5 million in 2001 dollars.[2] Consequently, Williams argues, even though the actual paper value of the Trust might have risen slightly between 1975 and 2001, the Trust has lost as much as 70 percent of its real-world value. Morgan argues that the Court cannot consider the real-world value of the Trust but must instead limit its inquiry to the absolute numbers, and under this criteria, Williams "has suffered no cognizable economic injury." (Reply Memorandum of Law of Defendant JP Morgan Chase Bank in Further Support of its Motion for Summary Judgment, dated Nov. 7, 2003 ("Reply") at 2.)

Williams argues that a resulting nominal net gain in the Trust's actual value over an extended period of time cannot, by itself, automatically defeat a claim that the trustee breached its fiduciary duty to preserve the principal. The Court agrees.

Morgan's argument would require a court to dismiss any claim for breach of fiduciary duty when the trustee's management of the funds at issue yielded some net gain, no matter how slight, and no matter how many real missed opportunities may have existed at various intervening points at which the trustee, in the exercise of proper fiduciary care, reasonably could have pursued a more profitable investment plan. Furthermore, the extension of Morgan's argument to its limit would mean that a trustee could always escape potential liability for a breach of its fiduciary duties simply by maintaining the entire trust principal at all times in cash or cash-equivalent fixed income securities. Such a narrow, if highly protective, investment strategy is bound in the long term to produce no loss of capital on paper. Thus, under Morgan's reasoning, as long as the trust suffered no diminution of principal, merely breaking even would always immunize the trustee from claims for breach of fiduciary duty. Consequently, simply by insulating the principal from any prospect of loss, the trustee would be under no obligation to exert any effort to improve the value of the trust and would risk no exposure to liability for absence of long term performance of the account. Such a constrained, categorical result cannot be correct.

---

1. Morgan also claims that the Trust actually gained $156,580 between January 1, 1975 and June 1, 2001 if assets paid out of the Trust in commissions, taxes and fees are included in the valuation of the Trust.

2. Williams relies on the Internet web site of the Federal Reserve Bank of Minnesota,

*http:// minneapolisfed.org/Research/data/us/calc/index.cfm*, which provides a means of calculating dollar equivalents in different years when adjusted for inflation. According to the conversion table, $767,123 in 1975 would be worth $2,525,232.03 in 2001, and $808,759 in 1975 would be worth $2,662,290.31 in 2001.

458

Banks hold themselves out to the public as possessing professional investment judgment and special skills honed and devoted to protecting and augmenting the value of funds entrusted to them. Their products and services are purchased by customers largely on the basis of such representations, which are central to the banks' ability to induce investment and earn profits from the customer accounts they manage. Yet, Morgan's theory would effectively nullify the pledge implicit in the relationship between the client and a bank serving as investment advisor or trustee under which the fiduciary undertakes to apply its financial knowledge and expertise to the utmost to preserve and enhance the value of the customer's accounts, and would also remove any incentive and duty the bank possesses to make good on the special services and talents it advertises. In essence, Morgan's contention would convert a trustee or investment bank into nothing more than a self-service warehouse for money, and render the banker a mere custodian with no more financial role or duty concerning the customer's funds than that of a bailee. Under this model, as long as the customer's trust account displays no net loss, even after an extended duration, trustee banks would fully perform the special fiduciary duties for which they are employed, and be entitled to earn corresponding fees and commissions, merely by storing the entire trust principal in a cash account, without being obliged to offer investors any better long term prospect for yield on their money than they would earn by keeping cash in a safety deposit box.

Morgan correctly notes that in *Janes' Estate,* an action against a fiduciary for failure to diversify the assets of a trust, the New York Court of Appeals did not adjust the damage award for inflation. *See* 681 N.E.2d at 339–40. But there is no indication in *Janes' Estate* that the New York court considered and rejected an argument to adjust the damages amount for inflation. The Court here is squarely faced with a question of whether the real-world value of assets must be taken into account when considering a damage award. Additionally, the fact pattern in *Janes' Estate* represents the far more typical action for breach of fiduciary duty than the case at bar, because in *Janes' Estate* the value of the trust had declined during the course of the mismanagement. Here, however, the situation is different. Morgan is not accused of failing to sell an investment before its value declined. Instead, Williams argues that Morgan, during an unreasonably long period—in excess of 25 years—and in the face of other available prudent opportunities to do so, failed to invest the Trust's assets in a manner that would have exhibited more reasonable financial judgment and thereby produced more profitable results for the Trust. A strict application of the formula set forth in *Janes' Estate* is inappropriate here.

In *Dennis v. Rhode Island Hosp. Trust Nat'l Bank,* 744 F.2d 893 (1st Cir.1984), the income beneficiaries and remaindermen of a trust sued the trustee for mismanagement of the trust assets. The district court had found that the trustee violated its duty to act impartially as between the income beneficiaries and the remaindermen, because the trustee had retained the trust's assets despite their steady decline in value so that the trust could continue to provide income to the beneficiary. *See id.* at 895–96. The district court imposed a surcharge on the trustee which was designed to restore the trust principal to its value on the date when the trustee should have reinvested the principle elsewhere. The First Circuit upheld a portion of the surcharge that accounted for inflation because "it seems reasonable ... to assume that a fair trustee would have maintained [the trust principal's] *real* value." *Id.* at 900

(emphasis in original). The Circuit Court noted the "basic trust law policies of providing income to income beneficiaries while preserving principal for the remaindermen," *id.*, and concluded that it saw "nothing unreasonable in assuming that the value of the corpus would have kept pace with inflation." *Id.* This Court, absent clear and controlling guidance from New York case law precisely on point, sees no reason not to make the same assumption here.

In reaching this conclusion, the Court does not intend to establish a specific amount of damages Williams may recover in the event that a trier of fact finds that Morgan breached its fiduciary duties. Instead, the Court's ruling merely indicates that Williams can establish some amount of damages sufficient to maintain a claim for breach of fiduciary duty.

## C. *LOST INCOME*

Morgan argues that any amount that Williams might recover for any possible breach of fiduciary duty is limited to the amount of lost capital in the Trust—an amount that Morgan argues does not exist. Morgan claims that Williams may not recover any possible lost income because, as a remainderman, Williams has no legal interest in the income of the Trust while the income beneficiary remains alive. Morgan also argues that, even if Williams could recover lost income, there was no lost income to the Trust.

### 1. *Standing*

■ Morgan correctly asserts that under New York law, an objecting beneficiary may not recover for the benefit of non-objecting beneficiaries. *See In re Penney's Estate*, 60 Misc.2d 334, 302 N.Y.S.2d 886, 887 (1969) (stating that under New York law, "[t]he objectant is limited to a recovery consistent with his interest in the estate"); *In re Purdy's Will*, 73 N.Y.S.2d 38, 49–50 (1947). As a remainderman,

Williams only has a legal interest in the trust principal; he has no legal interest in any lost income to the trust. Only Maria Williams, the income beneficiary, has a legal interest in any lost income to the trust. *See* Bogert, *supra*, at § 701 p. 194.

■ Morgan argues that because Williams, the remainderman, is the only plaintiff in this action, Morgan can be liable only for lost capital, and not for lost income, should the trier of fact should find that Morgan breached its fiduciary duty. Ordinarily Morgan would be correct. Here, however, the parties entered into a stipulation which directly bears on this issue.

In Paragraph 2 of a Stipulation and Order filed on April 23, 2001, Maria Williams unconditionally released Morgan from any "claims, demands, causes of action, objections to any accounting, and liabilities of any kind" that she may have had against Morgan relating to Morgan's management of the Trust. (Stipulation and Order filed April 23, 2001 (the "Stipulation") at ¶ 2(b), attached as Ex. G to Decl. of Peter Sherwin in Support of Defendant JP Morgan Chase Bank's Motion for Summary Judgment.) But later in the very same paragraph of the Stipulation, the following language appears:

> the foregoing release shall not be used as a defense to any claim properly asserted by Luiz Williams in the Action and . . . the relief on any claim properly asserted by Luiz Williams in the Action shall not be reduced or diminished by reason of the foregoing release or the fact that any claim is brought solely by Luiz Williams and not also by Maria Williams and/or Anthony Williams.

(Stipulation at ¶ 2(b).)

Paragraph 20 of the Stipulation refers to Maria Williams's release of her claims in paragraph 2 and states that paragraph 2 shall not be considered "a limitation on any

right Maria Williams ... may have to participate in or benefit from any relief awarded based upon a claim properly asserted by Luiz Williams in this Action." (Stipulation at ¶ 20.)

Morgan now argues that the Stipulation, particularly the language of paragraphs 2 and 20, simply enabled Williams to bring any claims he may have in federal court without the inclusion of Maria Williams as a necessary party. Morgan argues that the Stipulation cannot be interpreted to allow Williams to recover lost income, because that is a claim that only Maria Williams could bring, and she released all of her claims in the Stipulation.

Morgan overlooks the circumstances that prompted the parties to enter into the Stipulation in the first place. It also misreads an essential term of that agreement.

The Stipulation was the product of an impasse between the parties concerning whether Maria Williams was a necessary party who had to be joined, as Morgan insisted, in order for the litigation to involve all persons with critical roles and interests in the underlying dispute and to properly settle the rightful adjustment of all the parties' rights and duties. But compelling Williams to bring Maria Williams into the action as a defendant would have destroyed full diversity jurisdiction. At the Court's prodding to avoid further motion practice, the parties resolved the standoff by means of the Stipulation, benefitting both Williams by enabling the lawsuit to proceed here without naming Maria Williams, and Morgan through Maria Williams's release of any claims she might otherwise have had against Morgan.

By entering the Stipulation, Morgan avoided the risk of an adverse ruling from this Court that Maria Williams was not a necessary party to this lawsuit. Morgan also avoided the possibility that Maria Williams would bring a separate lawsuit against Morgan to assert any cause of action that might not have been precluded by any resolution of Luiz Williams's claims. The Stipulation ensured Morgan that it would be sued only once and in only one court for its role in managing the Trust. The Stipulation ensured Maria Williams that she would be entitled to share in any recovery that Luiz Williams obtained for Morgan's breach of fiduciary duties, because it expressly stated that "the fact that any claim is brought solely by Luiz Williams and not also by Maria Williams" could not provide the basis for reducing any recovery against Morgan. (Stipulation at ¶ 2(b).) Finally, the Stipulation ensured Luiz Williams that his action could proceed in this Court. Essentially, even if not labeled as such, what Maria Williams effected through the Stipulation is tantamount to an assignment to Luiz Williams of her right to prosecute any claim she may have had against Morgan for breach of fiduciary duty. In exchange, Morgan received an assurance that Maria Williams would not separately pursue any such claim or any other claims against Morgan.

Under the circumstances, it would be inequitable for Morgan now to use the Stipulation as a double-edged sword by effectively arguing that without Maria Williams in the lawsuit, Williams cannot recover on behalf of the Trust the full measure of damages that may have resulted from Morgan's alleged breach of fiduciary duty. This argument represents a backdoor attempt to reintroduce what the parties contemplated bargaining away through the Stipulation: Maria Williams's presence as a necessary party to this action.

Moreover, while Maria Williams did release all of her *claims* against Morgan, the Stipulation expressly states that if Luiz Williams properly asserts a claim, the *re-*

*lief* he recovers shall not be reduced by virtue of Maria Williams's failure to join Luiz Williams's action. The Stipulation clearly, and properly, distinguished between claims and relief. "Lost income" is not a claim, it is one type of relief that may be awarded under a claim for breach of fiduciary duty. Williams has properly brought a claim for breach of fiduciary duty. It is true that ordinarily the income beneficiary and the remaindermen would jointly bring a claim for breach of fiduciary duty to recover lost income and lost capital. But the plain language of the Stipulation allows for the absence of Maria Williams from this action and enables Luiz Williams to bring a claim for breach of fiduciary duty to recover all possible damages suffered by the Trust. Under the Stipulation, Maria Williams's absence cannot be the basis for limiting any relief on a properly-asserted claim by Luiz Williams. If Morgan breached its fiduciary duty and that breach resulted in lost income to the Trust, Morgan will be liable to the Trust for any such amount.[3]

### 2. *Lost income*

The parties dispute whether Morgan's management of the Trust resulted in any lost income to the Trust or the income beneficiary. Each side has retained an expert witness on damages. Those experts applied different techniques to calculate damages and arrived at vastly different figures. The Court does not need to resolve this dispute for the purposes of this summary judgment motion because it has already determined that Williams can establish some amount of damages for which Morgan will be liable should a trier of fact find that Morgan breached its fiduciary duty. Which expert's evidence and opinion as to damages should be credited,

based on assessments of their credentials, knowledge and credibility, as well as the amount of any such damages, are issues for the trier of fact to determine.

## IV. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that defendant J.P. Morgan & Co., Inc.'s motion for summary judgment is denied.

**SO ORDERED.**

---

**3.** Williams himself could not personally recover any damages for lost income, because those funds would belong to Maria Williams

as income beneficiary while she remains alive.